THOMAS KAIN, Respondent, *v.* JOHN G. SMITH, Appellant.

In the absence of notice to the contrary a servant has a right to assume the master will perform the duty imposed upon him, of furnishing proper, adequate and perfect implements and appliances necessary for the performance of any duty required of the servant.

Plaintiff was employed as a carpenter by defendant who was operating a railroad, he was directed to assist in loading car-wheels, which work was being done under the direction of a foreman. The car-wheels were in

pairs, connected by an axle and standing on a track ; and were loaded by an implement called a "jigger," one end of which was placed upon the tracks, and the other upon the platform of the car. It was composed of two side pieces, corresponding with the rails of the track, connected by cross-bars ; the end upon the car, was furnished with hooks to hold it in place. One side of the jigger was worn off so as to make it shorter than the other ; the hooks were worn off and blunted so as not to hold firmly to the car, and the cross-bars were worn and loose. After two pairs of wheels were loaded, the others were run along the track so as to give them a headway before striking the jigger; it was customary to load in this way. As the last pair was being loaded one end of the jigger slipped from the car, the wheels fell, struck and injured the plaintiff. Plaintiff had never before loaded car-wheels or seen them loaded, and did not know what a jigger was. Defendant's master-mechanic had, prior to the accident, been notified that the jigger was defective. In an action to recover damages, where these facts appeared, *held* (RAPALLO and EARL, JJ., dissenting), that the evidence tended to show plaintiff furnished an imperfect implement, and that the injury was occasioned thereby ; and so that the question of negligence and contributory negligence should have been submitted to the jury, and a nonsuit was error.

(Argued April 27, 1882 ; decided June 13, 1882.)

APPEAL from order of the General Term of the Supreme Court, in the third judicial department, made September 20, 1881, which reversed a judgment in favor of defendant, entered upon an order nonsuiting plaintiff on trial. (Reported below, 25 Hun, 146.)

This action was brought to recover damages for injuries alleged to have been caused by defendant's negligence.

The case is reported, upon a former appeal, in 80 N. Y. 458.

Defendant was, at the time of the injury, one of the board of directors and managers of the Vermont Central railroad, and one of three of said board who were operating the Ogdensburg and Lake Champlain railroad, under a contract with that company. One Ames was defendant's master-mechanic at Ogdensburg, having power to employ men, and having charge of the machinery and appliances, he hired plaintiff as a carpenter and set him to work at the yard in Ogdensburg, under Forrest, the foreman of the carpenters.

The further material facts are stated in the opinion.

*Edward C. James* for appellant. The burden was upon the plaintiff to show by competent proof, as an affirmative fact, that the injury was caused without any fault on his part. (58 N. Y. 250; 75 id. 332–3; 78 id. 480; 80 id. 622.) Where the circumstances point just as much to negligence of the injured party as to its absence, or point in neither direction, the plaintiff should be nonsuited. (75 N. Y. 332–3; 84 id. 62; 22 Hun, 78; *Stackus* v. *N. Y., etc., R. R. Co.*, 79 N. Y. 464.) Plaintiff, in entering the service, assumed the risks and perils incident to the use of the machinery and property of the employer as it then was, so far as such risks were apparent. (25 N. Y. 566; 49 id. 521, 534; 63 id. 447, 453; 76 id. 126.) Plaintiff, having failed to establish any negligence on the part of the defendant or his subordinates which caused his injury, was properly nonsuited on that ground. (*Henry* v. *S. I. R. R. Co.*, 81 N. Y. 376, 379.)

*Leslie W. Russell* for respondent. A railroad operator owes a duty to his employes which requires him to furnish adequate and proper machinery for the use to which it is to be applied, and to maintain it in like condition for their protection and safety. (*Flike* v. *B. & A. R. R. Co.*, 53 N. Y. 549; *Booth* v. *Same*, 73 id. 38; *Mehan* v. *Syracuse, Bing. & N. Y. R. R. Co.*, id. 585; *Steinway* v. *Erie Ry. Co.*, 43 id. 123; *Harvey* v. *N. Y. C. R. R. Co.*, 19 Hun, 556; *Stevenson* v. *Jewett*, 8 Weekly Dig. 4; 16 Hun, 210; *Salters* v. *D. & H. C. Co.*, 3 Hun, 338; *Ryan* v. *Fowler*, 24 N. Y. 410, 411, 414, 415; *Worster* v. *The Forty-second St. R. R. Co.*, 50 id. 203, 205; *Willy* v. *Malledy*, 78 id. 310; *Swords* v. *Edgar*, 59 id. 33; *Hawley* v. *N. C. R. R. Co.*, 82 id. 370; *Mehan* v. *S., B. & N. Y. R. R. Co.*, 73 id. 585.) If the defendants' negligence in furnishing the defective machinery caused the injury in part, he is not excused from liability if the negligence of a co-employe of the plaintiff in the use of it contributed to the accident. (*Cone* v. *D., L. & W. R. R. Co.*, 81 N. Y. 206.) In an action for negligence, to justify a nonsuit on the ground of contributory negligence, the undisputed facts must show the omission or commission of

some act which the law adjudges negligence; the negligence must appear so clearly that no construction of the evidence or inference drawn from the facts will warrant a contrary conclusion. (*Stackus* v. *N. Y. C. & H. R. R. R. Co.*, 79 N. Y. 464; *Hart* v. *The H. R. Bridge Co.*, 80 id. 622; *Payne* v. *T. & B. R. R. Co.*, 83 id. 572.) Even where the knowledge of defects comes to the servant, it is a question for the jury to decide as to whether his negligence amounted to a contribution on his part, and it is only in a very extreme case that the court will decide it to be a matter of law. (*McMahon* v. *Port Henry Iron Ore Co.*, 24 Hun, 48; *Sprong* v. *B. & A. R. R. Co.*, 58 N. Y. 56; *Laning* v. *N. Y. C. R. R. Co.*, 49 id. 521, 536, 537; *Willy* v. *Malledy*, 78 id. 310; *Hawley* v. *N. C. R. R. Co.*, 82 id. 370.) The employe has a right to assume the suitable character of the machinery for all purposes for which it is furnished to be used. (*Stevenson* v. *Jewett*, 16 Hun, 210; *Swords* v. *Edgar*, 59 N. Y. 28, 33; *Willy* v. *Malledy*, 78 id. 310; *Mehan* v. *S., B. & N. Y. R. R. Co.*, 72 id. 585.)

DANFORTH, J. The plaintiff was nonsuited at the Circuit upon a ground not now claimed to be tenable, and the judgment was reversed and a new trial ordered by the General Term, because in their opinion the case was one proper for submission to the jury. Upon this appeal the learned and ingenious counsel for the defendant submits the following propositions as reasons for reversing the order and restoring the judgment. *First.* Plaintiff's negligence contributed to the accident. *Second.* There was no negligence on the part of the defendant or his subordinates, which caused the injury. The learned counsel has frankly accepted a recent decision of this court, as embodying the rule of law by which the defendant must abide in seeking for an answer to these propositions, viz.: " To justify a nonsuit on the ground of concurring negligence, the negligence must appear so clearly that no construction of the evidence, or inference drawn from the facts, would have warranted a contrary conclusion, and that a verdict the other way would have been set aside as against evidence. (*Stackus* v. *N. Y. C. & H. R. R. R. Co.*, 79 N. Y. 464.)

I have carefully examined the testimony in the light of the earnest argument of the appellant's counsel, and am unable to find any conduct of the plaintiff, which in judgment of law contributed to the injury. In this respect, so far as I can discover, we are in accord with the trial judge, as we are with the General Term. But what is the case? The defendant was, for the purposes of this question, a railroad proprietor, the employer and master of the plaintiff (80 N. Y. 458), and as such bound to furnish him, in the performance of any duty required at his hands, proper, adequate and perfect implements and appliances necessary for such proposed work. This obligation was implied as part of the contract of service, and in the absence of notice to the contrary, the plaintiff had a right to assume that it would be performed. Moreover, he was ignorant of the duties of his place, of the kind and proper qualities and fashion of machinery which would be given him to use. But of these things the defendant had knowledge. On that also the plaintiff might prudently rely.

Before the 1st of May, 1872, he was a sailor and carpenter. At that time he went into the defendant's employment in the capacity of a carpenter — a car repairer — and was placed under one Forrest, the "foreman in the old shop and yard," and on the day in question, May 27, 1872, was directed by him to go with others and get a certain implement called a "jigger," and load wheels upon a flat car. Before that time he had neither loaded car-wheels, nor seen any loaded, nor did he know what a jigger was. The car-wheels were two wheels fastened on an axle, together weighing upwards of twelve hundred pounds, and were then standing on the track, about one hundred and fifty feet from the car. The jigger was between ten and twelve feet long; the car three and one-half feet high; one end of the jigger was placed upon the car, the other on the track; six or seven men were engaged with the plaintiff in loading the wheels. "Forrest was there, seeing that the wheels were loaded. He was giving directions about it." They shoved two pairs of wheels up without running them on the track. Some one said, "the best plan was to run the

wheels, give them a headway and they would run half way up
the jigger without any shoving." Forrest was there, standing
within ear-shot, close to the car. " This was done successfully
with all but two pairs, when, as the plaintiff says, " the last
pair we run up, the jigger fell off, and the wheel jumped
round and broke my leg." He was between the rails on the
track, and between the rails of the jigger. He says, " while I
was lying there I looked at the jigger. I didn't know what it was
that gave way and let the wheel down, and the first place I looked
at was at the grabs that were on the end of the jigger—the hooks
that go over and pass down. I saw that one of them looked
blunt and short. It appeared to be about three-quarters of an
inch thick at the edge where it should have been sharp. It
was blunt instead of being sharp. * * * The jigger when it
fell did not fall completely to the ground ; one end of it hung
on the car and the other end fell down. By the ends I mean
what I call the grabs. The right side fell off, and the left re-
mained on. When I was lying there on the ground I took
particular notice in looking at the grab on the right side, to
see what gave away, and I thought it looked shorter than the
other one."

A jigger is described as consisting of two side pieces of
equal length, two cross pieces with bolts or tenons through
them, fastening to the side pieces, and iron hooks, or grabs, at
one end, so pointed as to fasten on the car and keep the jigger
in place. The end of the right side of this jigger was worn off,
and so was shorter than the other, and the plaintiff says " that
made a jump which caused the jar." That side swung from
the car and the right wheel of the two fell from it. He saw
this after, but not before he was hurt ; did not before notice it.
" The jigger," he says, " slipped down and the wheel jumped
round and struck me on the leg."

*Schrier* testified that the jigger, if properly constructed,
would fit square on to the track, and present no abrupt point ;
that, going at a slow run, if the jigger is properly constructed,
there is no reason why the car-wheels should jump. " I should
consider if it struck it on a run at all it would jump. I should

consider it is according to the fastness of the run. I should not consider that if after a wheel has jumped up, it runs right along straight up the jigger, the fact that the running has been adopted to force it along, has any effect whatever upon the running up the rest of the way, if it was going all straight. *The jigger should be constructed so that the grabs should* be sharp to hold them to their place, not necessarily too sharp, but sharp enough to hold them to the bed of the car; the weight of the wheels would hold them. I can't say how long they should be for a ten or twelve-foot jigger; long enough to hold, long enough so that they have a proper bearing on the car. They should not be blunt at the ends."

*Curbeau* testifies that he was one of those engaged at the same time with plaintiff in loading these wheels; it was his first experience in that business. He says, "the bottom end of the jigger, as it rested on the rail, was broomed up, affected in both ends and running along up the jigger. I mean by brooming up, as though you took a stick in your mouth and chewed it, and the end was broken off. It was an old break; one was broken off more than the other"; he thinks the right hand stringer. He says, "between the breaking, and what was worn off, I think there must have been two inches or more broken off. I mean," he says, "it was two inches short, it was partly broomed up six or eight inches, and all the way up the jigger where the wheel ran. Both sides were pretty well worn in the joints. Those cross bars were defective, the joints were loose, so that the jigger would weave in that way; if there was a heavy pressure come on one side or the other it would have a tendency to break up."

"By the court: That is that the cross bars were not firmly in the timber that constituted the main parts of the jigger?

Answer. Yes, sir. The wood was also worn. I did not notice anything particular in regard to the grabs, any more *than they were short.* They were about an inch or an inch and an eighth in length, where the angle begins to the end of the grab. They were blunt. The thickness of the iron at the point was a quarter of an inch. There was no stick provided to go across, to my knowledge no rope was provided."

The length of the jigger: This witness says the jigger was not long enough; it should have been fifteen or sixteen feet; "you could then load it with more ease and less danger." He loaded car wheels with this jigger. He had seen it fall off "may be two or three times before that."

The court: "That is, the jigger fell off from the car?"

A. "Yes, one side of it dropped off from the car while we were loading wheels.  *  *  *  *  I had noticed the condition of this jigger prior to this accident. Before this happened, I was looking at it one day — before this· accident — about six months before the accident; I found out it was worn off and broomed up on the lower end there, and the cross bars going through the tenons were loose so that the jigger was going this shape — zig-zag."

The court: "The cross bars were loose in the side bars?"

A. "*Yes, sir; so that the jigger wabbled.* I noticed the grabs were too short and blunt. I told Mr. Forrest we had ought to have a new jigger made; the old one was played out. The reply that he gave me: he said that he hadn't lumber for to make a new one, that he would have to use the old one. He never spoke any thing more to me about it, nor I to him. This conversation with Mr. Forrest was about six months before this accident happened; somewhere in the fall of 1871.  *  *  *  *  The cars were never loaded without the men running the wheels up on the jigger to my knowledge; ordered to run them — I saw them loaded very frequently. I had some experience in loading car wheels. They could not load those car wheels without giving them a running start, without more help. They could not have loaded that car with those wheels without more help, without running them."

From this evidence it is obvious that the implement furnished was not a perfect implement, and it might well be found that it was used in the ordinary way, and that the wheels could not have been loaded in any different manner from that adopted. Indeed, it is assumed by the learned counsel for the appellant that the jigger was old and out of repair, and pointing to the proposition now before us — that of concurring neg-

ligence, he says: "The plaintiff and his fellow workmen took this old jigger to load these wheels. The plaintiff was in a hurry to get away. Instead of rolling the wheels up the jigger carefully and slowly, as they first began, they got to running them down the tracks on the full run, making the jigger jump every time they struck it, and finally they knocked the jigger out of place and the wheels run off and hurt the plaintiff." It is not pretended that the plaintiff was guilty of the omission of any prescribed duty, or of any misconduct whatever; on the contrary he with his associates were working under the eye of the foreman, and for aught that appears, to his satisfaction.

Now as to the mode of getting the wheels into the cars: Can the law pronounce it negligent or careless? Had the plaintiff any reason for supposing it was not the proper way? He had been told to obey Forrest, who was giving directions about it. There was difficulty in getting the wheels up; some one said "run them up." The evidence would warrant a finding that this was said by Forrest. The plaintiff so understood it, and Forrest does not deny it. If he did not say it, he at any rate saw the process, and did not interfere. More than that, several wheels were run up successfully. Was the speed an improper one? On his direct examination the plaintiff says the run was to give them a headway. Did they do more than this? Were they, indeed, on "full run?" The evidence is, they were "run" to the jigger. Does this mean the highest rate of speed, or a less rate; and if the latter, how much less?

As to the jump of the wheels, the witness says the wheels gave a "little jump" as they struck the jigger—"may be an inch or a half an inch." He also says this was because one end of the jigger was shorter than the other. Nor is it certain, from the proof, that if the jigger had been of full and equal length, and in sound condition, it would not have carried the wheels to the car, despite the manner of loading it. Was there, in fact, any departure from the customary and proper mode of loading such bodies? But "the plaintiff was in a hurry to get away." Was that evidence of negligence? What is the

testimony ? He asked Forrest " if he would allow him to get off at five o'clock," and was told he could go when the wheels were loaded. What inference of undue haste does the law attach to this desire ? What reason had the plaintiff, at any time, for supposing that it was less safe to load the wheels in one way than the other ? One witness testifies, wheels were always so loaded ; that it was so ordered. Had not the plaintiff the right to rely somewhat, and if so, to what extent, on the experience of the foreman, or even on that of his associates ? Is the only inference fairly deducible from the facts one of negligence ? If not the court could not declare as a matter of law that the plaintiff was guilty of it, and the case should have been submitted to the jury, not only to determine what the facts were, but the proper inferences to be drawn from them. (*Swords* v. *Edgar,* 59 N. Y. 28; 17 Am. Rep. 295; *Hart* v. *Hudson River Bridge Co.,* 80 N. Y. 622; *Stackus* v. *N. Y. C. & H. R. R. Co.,* 79 id. 464; *Payne* v. *Troy and Boston R. R. Co.,* 83 id. 572.)

*Second :* The evidence tends to show that the defendant did not furnish the plaintiff an adequate implement, and that the injury to him occurred thereby. The jigger was imperfect and had been for several months ; one side was so worn or broken as to be shorter than the other ; the bolts or tenons were loose ; the whole machine "wabbled," or "weaved," or moved "zig, zag" when pressed; the grab-irons were so worn as to be blunted and of no use, presenting an end three-quarters of an inch on the surface where it should have been sharp. Whether the effect of these things was not to change the center of gravity of the wheels, and so throw a heavier weight upon one side of the jigger than it was intended to bear, and thus throw it from the car, and whether this result was aided by the want of a grip upon the car itself ; whether indeed the accident was not altogether owing to these defects, was necessarily a question for the jury.

It is not denied that the defendant is chargeable with the neglect of Ames and Forrest, the master-mechanic and foreman, to discover and remedy the defects, if any existed. Nor could

it well be denied. They were easily discovered; the jigger was in sight and seen daily by both of these agents of the defendant. Forrest indeed had direct notice that a new jigger was needed, "that the old one was played out." His excuse was that he had not timber to make a new one, and the old one must be used. This was before the accident.

It is said the plaintiff might also see the defects. True, but he did not know the effect of such deficiencies, and was, moreover, directed by his superior to get and use the implement, and whether under these circumstances he should be charged with knowledge and with negligence by reason of it, was also for the jury. (*Gibson* v. *Erie Railway Co.*, 63 N. Y. 449; 20 Am. Rep. 552; *Abrahams* v. *Reynolds*, 5 H. & N. 143; *Senior* v. *Ward*, 1 El. & El. 385; *Hutchinson* v. *N. Y. N. & B. R'way Co.*, 5 Exch. 343–354.) The question was whether the plaintiff took ordinary care in doing the work intrusted to him, and in determining this he was entitled to appeal not only to the evidence, but to the general knowledge of the jury. The law cannot determine it. It has no code formulating the effect upon one's conduct of a desire for an early release from a day's labor, or regulating the rate of speed which, without imputation of negligence may be given to a moving body for the purpose of overcoming its inertia, and thus aiding its ascent on an inclined plane. It depends upon the application of the facts and circumstances proved, to the position of the party.

In this case the jury might have found that the plaintiff was in the exercise of ordinary care, without being chargeable with bias, prejudice or passion, and that an implement whose parts were of unequal length where they should have been equal, whose joints were loose and infirm where they should have been tight and steady, and whose grip-iron was so blunted that it would not hold, might be pronounced by them unsafe and unfit for the purpose to which it was devoted, and also find that the injury from which plaintiff suffered was caused thereby, without violating their duty.

We therefore concur with the General Term in thinking the whole case should have been submitted to the jury. The order

appealed from should be affirmed, and under the stipulation the plaintiff must have judgment absolute.

All concur, except RAPALLO and EARL, JJ., who dissent.

Order affirmed and judgment accordingly.