as a completed act of fraud, or as an intent to commit a fraud, whether the contractor obtained the money or not. But here, again, the indictment is fatally defective. It charges that Cunningham was employed at a grossly excessive price, but it fails to allege that the defendant knew the price was excessive, or that his intention was to cheat the city in awarding it at such price. The scienter or intent is the very gist of either an indictment or a civil complaint, in a case of fraud. Nor is the case helped out by the allegation of fraud or knowledge in the concluding paragraph of the indictment. There it is alleged that the defendant certified bills in favor of Cunningham for the work done under the contract, knowing that they were in excess of the true value of the work, with intent to defraud the city. It is not alleged or claimed, however, that the bills were in excess of the contract price. It may very well have been that the defendant knew when he certified the bills that they were in excess of the true value of the work; but if they were in accordance with a legal contract, previously entered into in good faith, it was his duty to certify them, whether the prices at which the work had been let were excessive or not. Some of these criticisms on the indictment may seem technical, but a good criminal pleading must necessarily be accurate and logical. No indictment for murder would be good unless it charged the intent to kill, and no detail in the narrative of the offense, showing the cruelty and deliberation with which it was perpetrated, could supply the absence of the allegation of intent, which is the gist of the crime. So in this case we have pointed out what are the essential elements of a proper indictment for fraud. The intent is a traversable allegation, with which the defendant can take issue, and which the jury must find before he can be convicted. The absence of a proper allegation is fatal to the pleading.

---

YOUNG et al. v. SYRACUSE, B. & N. Y. R. CO.

(Supreme Court, Appellate Division, Fourth Department. November 22, 1899.)

1. RAILROADS—INJURY TO EMPLOYE—NEGLIGENCE—SWITCHES.

Whether a railroad company was negligent in unnecessarily placing a switch just beyond a water tank, so that the danger signal thereon could not be seen till a train was within 60 feet of it, leaving insufficient time to stop the train, is a question for the jury.

2. PROXIMATE CAUSE.

Where a switch was left open by an unknown party, and a train ran into, it is for the jury to say whether negligence of the company in unnecessarily placing it behind a water tank, so that the danger signal could not be seen till the train was within 60 feet of it, whereas it could have been placed so that it could be seen 600 or 800 feet away, affording time for stopping the train, was a proximate cause of the accident.

3. ASSUMPTION OF RISK—CONTRIBUTORY NEGLIGENCE.

Whether the engineer of a train which ran into a switch, unnecessarily placed behind a water tank, so that the danger signal on it could be seen only 60 feet away, assumed the risk, or was guilty of contributory negligence, is a question for the jury, though he knew of the switch, and though rules of the company, of which he knew, required engineers to approach

switches with great care, having their trains, if possible, under such control as to be able to stop them from running into an open switch, and though the train, which was an express train, scheduled to make rapid time, and which did not stop at the station at which was the switch, but was approaching the main street crossing, was running 40 miles an hour.

Smith, J., dissenting.

Appeal from trial term, Onondaga county.

Action by William Young and another, administrators of George Young, deceased, against the Syracuse, Binghamton & New York Railroad Company. From a judgment of nonsuit, plaintiffs appeal. Reversed.

On the night of December 1, 1895, the plaintiffs' intestate, who was an engineer in the defendant's employ, was killed at Preble station, upon the line of the defendant's road, while engaged in running an express train from Syracuse to Binghamton. At the above-mentioned station there are two main tracks, running north and south, the west track being used by the south-bound trains and the east track by those going north. In 1881 the defendant erected a water tank upon the west side of its track, and about 500 feet north of the station house. This tank was a solid frame structure, some 27 feet in height and 23 in diameter, and was located about 4 feet from the westerly rail of the south-bound track. At the time this tank was erected, the defendant also constructed a side track, which ran around the station house upon the west side thereof, and connected with the south-bound track at a point some 15 or 20 feet south of the water tank, such connection being made by what is known as a "Wharton safety switch." This switch worked automatically, and it was impossible for a train going south to leave the main track and go upon the siding unless the switch was properly adjusted for that purpose, and held in position until the train had left the main track. Upon the night in question some unknown miscreant had turned the switch, and by means of a board or brace had blocked the same, so that a train going south would necessarily run upon the siding. The train of which the plaintiffs' intestate was the engineer approached Preble station at about 11 o'clock in the evening of December 1st, upon the south-bound track, at the rate of 35 or 40 miles an hour, and, running upon the siding, came into collision with some freight cars which were standing there, in consequence of which the engine was wrecked, and the engineer and fireman were both killed. The switch in question was so constructed as to display a red target by day and a red light by night when it was open from the main track to the side track, and at the time of the accident a red lamp or danger signal was lighted and turned towards the north, but by reason of the intervening water tank it was not visible to the engineer of the train approaching from that direction until the train was within 60 feet of the switch. It is undisputed that the switch might have been located at some less obscure point, and it appears that when the photographs offered in evidence upon the trial were taken it had in fact been removed, and that the connection which it afforded with the main track had been abandoned. Upon the foregoing facts, as well as upon some others, to which reference will be made later on, the learned trial justice nonsuited the plaintiffs, and from the judgment entered thereon this appeal is brought.

Argued before HARDIN, P. J., and ADAMS, McLENNAN, SPRING, and SMITH, JJ.

George W. O'Brien, for appellants.
Peter B. Cole, for respondent.

ADAMS, J. It is a fact of which courts will take notice that switches are not only necessary appurtenances to all steam railroads, but that their general use has a tendency to increase quite materially the risk which attends the operation of such roads. It

was probably in recognition of this fact that the defendant made some attempt to guard against the contingency which was liable at any time to occur at this particular switch by attaching thereto certain signals, the import of which was doubtless well understood by all its employés, and if, in making this provision, it exercised a reasonable degree of care for the safety of its employés, it did all that could be legally required of it. But can it be said, as a matter of law, that this was done? It is a conceded fact in the case that this switch was so located with reference to the water tank, some 15 or 20 feet distant therefrom, as to be of little or no practical benefit as a signal of warning to the defendant's employés in charge of a train approaching it upon the south-bound track, for the reason that it could not be seen for a distance of more than 60 feet; and it was fairly demonstrated by this very catastrophe that a train running at the rate of 35 or 40 miles an hour could not be stopped within that distance, even by the use of what is known as the "emergency brake." The evidence also tends to show that no necessity existed for thus locating this particular switch, but that, on the contrary, it might have been so placed—as is the custom upon at least one other road—that its signals could have been observed at a much greater distance without impairing the use for which it was designed; and in view of these circumstances we think it was for the jury to say whether the defendant had fulfilled the legal obligation which rested upon it to make use of all reasonable care to provide for its servants a safe place in which to render the service required of them, as well as proper and safe appliances with which to perform that service. Having reached this conclusion, it becomes important to determine whether the defendant's omission of duty, if there was any, can be said to have been the proximate cause of the disastrous consequences which followed.

That the misplacement of the switch by some person, for whose criminal conduct the defendant, so far as appears, is in no wise responsible, was the moving or proximate cause of the death of the plaintiffs' intestate, there can be no doubt; but it sometimes happens that several causes concur to produce certain results, and in such case any one of them may be termed "proximate," provided it appears to have been an efficient cause. Ring v. City of Cohoes, 77 N. Y. 83; Phillips v. Railroad Co., 127 N. Y. 657, 27 N. E. 978. In this case, as has been suggested, the train in question was, by reason of the misplaced switch, certain to come into contact with the freight cars which stood upon the siding, if the rate of speed at which it approached was maintained; but, on the other hand, it is by no means certain that the accident could not have been avoided, notwithstanding the condition of the switch, if its location had been different. Indeed, a nonsuit having been granted, we think it may properly be assumed, for the purposes of this review, that, if the switch had not been pretty effectually hidden from view by the water tank, the plaintiffs' intestate would have seen the danger signal attached thereto at a distance of at least 600 or 800 feet, which would have afforded him ample opportunity to stop his train

before leaving the main track; and, if this be so, then the jury, upon the evidence now before us, would have been justified in finding that the location of the switch in such close proximity to the water tank was an efficient and proximate cause of the accident which resulted in the death of the plaintiffs' intestate. We come, therefore, to the consideration of the remaining question in the case, which is whether the risk of death or injury by reason of the alleged improper location of this switch was one which was assumed by the plaintiffs' intestate when he entered the defendant's service. It is an undoubted rule that an employé who contracts for the performance of hazardous duties assumes such unavoidable risks and perils as are incident to the duties which he is called upon to perform, provided such risks and perils are apparent. Gibson v. Railway Co., 63 N. Y. 449; Kennedy v. Railway Co., 145 N. Y. 288, 39 N. E. 956; Evans v. Railroad Co., 12 Hun, 289. But this rule has no application where the master has not fulfilled the obligation which rests upon him to exercise a reasonable degree of care in furnishing his servants a safe place in which, and suitable appliances and machinery with which, to perform the service required of them. Ellis v. Railroad Co., 95 N. Y. 546; McGovern v. Railroad Co., 123 N. Y. 280, 25 N. E. 373; Bennett v. Railroad Co., 21 App. Div. 25, 47 N. Y. Supp. 258. It would seem to follow, therefore, that if, in this case, the jury might find that the switch in question was improperly located,—or, in other words, that the defendant, in so locating the same as to render the danger signal thereon inefficient for the purposes for which it was intended, was guilty of an omission of duty which it owed to the deceased in common with its other servants engaged in the performance of like duties,—it cannot be said, as a matter of law, that the risk thereby involved was one which was assumed by the deceased.

It is urged, however, that the plaintiffs' intestate knew, or was bound to know, of the dangerous location of the switch, and that, consequently, it may be asserted that if, with this knowledge, he elected to remain in the defendant's employ, he thereby assumed this additional and unnecessary risk of his employment. Undeniably, it does appear that the deceased had been in the defendant's service a number of years, during which time he had frequently had occasion to pass this switch, and consequently it may doubtless be assumed that he was aware of its location, and, to some extent at least, of the incidental danger which was liable to result therefrom. It likewise appears that one of the defendant's rules required engineers to approach switches with great care, having their trains, if possible, under such control as to be able to stop before running off in case a switch happened to be improperly adjusted, and that presumably the deceased was aware of the existence of this rule. But, with all these elements in the case, we still think it cannot be said, as a matter of law, either that the risk was an assumed one, or that the deceased was guilty of contributory negligence. It is not difficult to conceive of instances where, if a servant accepts or continues in service with knowledge of the character and position of structures from which he is liable to receive an in-

jury, he cannot, with any propriety, hold the master liable, and of this class of cases that of Gibson, supra, is a type. In that case the roof of a depot building projected so near the defendant's track that a conductor, in attempting to climb over the top of a car while his train was under way, was struck and killed. But it is to be observed that in this instance the peculiar character of the dangerous structure was perfectly patent; that the injured party was familiar with it; and that, when struck, he was not engaged in any duty which distracted his attention from the danger which confronted him. We believe it to be settled, however, by repeated adjudications, that a servant is not bound at all times and under all circumstances to be mindful of the dangers which surround him while engaged in the performance of his duty, even though he may be well aware of their existence. In the case of Wallace v. Railroad Co., 138 N. Y. 302, 33 N. E. 1069, a brakeman, while in the performance of his duty upon the top of a car attached to a moving train, was struck by a bridge which extended over the track. He had been in the defendant's employ for several weeks, and was perfectly familiar with the character and location of the structure with which he came into contact, but it was held that he could not, as a matter of law, be charged with carelessness because he did not bear constantly in mind its precise location. So, in the case of Benthin v. Railroad Co., 24 App. Div. 303, 48 N. Y. Supp. 503, and in that of Brown v. Same Defendant, 42 App. Div. 548, 59 N. Y. Supp. 672,—both of which were recently decided by this court,—it was held that a fireman, while engaged in the performance of some duty which distracted his attention, could not, as a matter of law, be adjudged guilty of contributory negligence because he, for the time being, was unmindful of certain structures which had been erected in close proximity to the track upon which his train was running, and of the existence of which he had knowledge; and it was also held that the risk in these cases was not an assumed one, even though, with such knowledge, the injured party continued in the master's service. See, also, McGovern v. Oil Co., 11 App. Div. 588, 42 N. Y. Supp. 595. We think the cases last cited are decisive of the principle involved in the present case, when all its circumstances are taken into account. The plaintiffs' intestate was the engineer of an express train, which was scheduled to make rapid time. It did not ordinarily stop at Preble station, and obviously there was no intention of its stopping there the night of the accident. On the contrary, it was approaching the station and the main street of the village, which intersected and crossed the railroad just south of the station, at a high rate of speed. It was manifestly the duty of the engineer at this time to be watchful and vigilant as his train approached the highway crossing, lest it should collide with some person or vehicle thereon. It was doubtless his duty also to be mindful of the condition of the various switches along the line of the road. But to say, as a matter of law, that while approaching a highway crossing he must bear in mind the precise location and character of every switch in the immediate vicinity while running at the rate of 40

miles an hour, or that he must reduce the speed of his train to such a degree as to enable him to stop it within 60 feet of any danger which suddenly confronted him, is an exaction which, in our opinion, is beyond the requirements of any reasonable rule, and one which ought not to be enforced under the somewhat peculiar circumstances of this case. The sum of the matter consequently is that upon the evidence in the case, as it stood when the nonsuit was granted, it was, as we think, for the jury to say whether the defendant was guilty of an omission of duty which it owed the plaintiffs' intestate in locating the switch where it did, and, if so, whether such omission was an efficient proximate cause of the accident which happened on the night of December 1st. Furthermore, the jury should have been permitted, in the event that these two propositions were resolved in favor of the plaintiffs, to determine whether, in the circumstances of the case, the plaintiffs' intestate assumed any incidental risk which resulted from the negligent location of the switch; or, in other words,—and what amounts to the same thing, in this instance,—whether he was guilty of contributory negligence in failing to bear in mind the precise location and character of this switch as he approached the same. The refusal to submit these questions to the jury constituted error, which, in our opinion, requires a reversal of the judgment appealed from.

Judgment reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur, except SMITH, J., who dissents in an opinion.

SMITH, J. I cannot concur in this decision. In the Sweeney Case, 101 N. Y. 520, 5 N. E. 358, the rule, as stated in the headnote, reads:

"A servant accepts the service subject to the risks incident to it; and where, when he enters into the employment, the machinery and implements used in the master's business are of a certain kind, and the servant knows it, he voluntarily takes the risk resulting from their use, and can make no claim upon the master to furnish other or different safeguards."

In the Hickey Case, 105 N. Y. 26, 12 N. E. 286, the headnote reads:

"An employé, in accepting service with a knowledge of the character and position of the machinery he is required to operate, takes the risks of such perils as are incident to the use of the machinery in its then condition and are apparent, and he cannot call upon the employer to make alterations to insure greater safety."

It is idle to cite further authority to a doctrine which is now firmly grounded in the law of negligence. I am unable to see why the case at bar does not come within the very letter of the rule stated in these cases. The warning signal upon this switch, indicating whether it was open or shut, could only be seen for 60 feet by reason of the obstruction of this water tank. This condition had existed since 1881,—more than 14 years. The danger was apparent, and the risk perfectly obvious. The plaintiff's intestate had been upon the road since 1881. He constantly passed and repassed this point. That he was perfectly familiar with this situation, and with such danger as it involved, cannot be questioned, and is not questioned in the prevailing opinion. Upon what principle, or upon

what authority, is it sought to relieve him from the legal responsibility of having assumed the risk? In the prevailing opinion the general rule is recognized that the employé assumes apparent risks. The learned judge then proceeds to say that this rule has no application where the master has not fulfilled the obligation which rests upon him to exercise a reasonable degree of care in furnishing his servants safe places in which, and suitable appliances and machinery with which, to perform the services required of them. In this, to my mind, is found the fundamental error in this decision. If, before an employé can be held to have assumed the apparent risks of the place provided for him in which to work, the master is bound to use reasonable care to make that place safe, the doctrine of the assumption of apparent risks is stripped of its vitality, and means nothing. The jury may then say whether the master has the right to use machinery and appliances that are not of the latest pattern, and whether his failure to provide the best machinery and latest appliances is not a violation of his duty to use reasonable care. But, to provide for just this condition, the doctrine of assumed risks has arisen, and found its place in the law of negligence. The master may provide such place to work and such machinery as he shall choose. If the servant undertakes the employment, and continues therein, he assumes such risks as are incident to the situation and obvious. The master is not required to take better care of his servant than the servant would take of himself. Nor is the position of the court sustained by authority. There are some cases in which it is said that the doctrine of assumed risks is subject to the qualifications stated in the prevailing opinion. Those, however, are not cases where the assumed risk has been from permanent structures existing, and the danger involved obvious. The distinction is clearly pointed out in Davidson v. Cornell, 132 N. Y. 234, 30 N. E. 575, in which Judge Bradley says:

"It is, however, urged by the defendants' counsel that, although they may not have been as firmly supported as they should have been, the plaintiff, having been engaged in the work for considerable time, knew the situation of the girders, that they were neither braced nor bolted at their ends to the brackets on the crossbeams, and assumed such hazards as were incident to the operation of the platform on which he was engaged in the service. It is, as a general rule, true that a servant entering into an employment which is hazardous assumes the usual risks of the service, and those which are apparent to ordinary observation; and when he accepts or continues in the service with the knowledge of the character of the structures from which injury may be apprehended he also assumes the hazards incident to the situation. Gibson v. Railway Co., 63 N. Y. 449; De Forest v. Jewett, 88 N. Y. 264; Sweeney v. Envelope Co., 101 N. Y. 520, 5 N. E. 358; Hickey v. Taaffe, 105 N. Y. 26, 12 N. E. 286; Williams v. Railroad Co., 116 N. Y. 628, 22 N. E. 1117. Those not obvious, assumed by the employé, are such perils as exist after the master has used due care and precaution to guard the former against danger. And the defective condition of structures and appliances which, by the exercise of reasonable care of the master, may be obviated, and from the consequences of which he is relieved from responsibility to the servant by reason of the latter's knowledge of the situation, is such as is apparent to his observation. Kain v. Smith, 89 N. Y. 375; McGovern v. Railroad Co., 123 N. Y. 280, 25 N. E. 373."

The distinction is again referred to in the Knisley Case, 148 N. Y. 378, 42 N. E. 986.

Again, in the prevailing opinion it is said that the servant is not bound at all times and under all circumstances to be mindful of the dangers that surround him while engaged in the performance of his duty, even though he may be well aware of their existence. If the doctrine of the assumption of obvious risks has any vital force, how can it matter whether or not the servant has in mind the danger? This fact clearly has significance if the question be one of contributory negligence. If it be one of the assumption of obvious risks, it is clearly immaterial. Under that doctrine the master is absolutely relieved from liability resulting from that risk. There is no question of the care or the negligence of the employé. It is a contract exemption absolute. This proposition hardly needs authority. In Railroad Co. v. Orr, 84 Ind. 50, the rule was stated that an assumption of the risk by a servant will exonerate the master from liability, although the servant was free from negligence. In Morris v. Gleason, 1 Ill. App. 510, it was held that, although an explosion was not caused by the fault of the injured servant, yet if he was aware that the boiler was defective, he cannot recover, whatever care he took to prevent the explosion or avoid the effect thereof. Much confusion has arisen in the books by reason of the failure to clearly distinguish between the defense of contributory negligence and that of an obvious risk assumed. The one may be proven, in this state, under a general denial; the other is an affirmative defense, which the defendant must plead. It is true there are cases where it is difficult to determine whether or not the risk is an obvious one. In such cases the defenses come very close to each other, and in this class of cases are found expressions which have caused the confusion. Such cases are the cases upon which the appellant here relies. In the Wallace Case, 138 N. Y. 302, 33 N. E. 1069, where there was a low bridge, there were also required to be telltales as a warning before the bridge was reached. These were gone. The risk which a brakeman assumed was a risk of the low bridge when warned by these telltales, and not the risk of the bridge without the telltales. That risk was not necessarily obvious. He may not have known that the telltales were gone. The plaintiff was allowed to recover upon the negligence of the defendant in not having the telltales which the statute required. In the Benthin Case, 24 App. Div. 303, 48 N. Y. Supp. 503, the risk was not an obvious one. In that case the fireman, while looking back from his engine, in discharge of his duty, was struck by a telegraph pole that was bent over to within four inches of the side of the locomotive upon which the deceased stood. Justice Follett, in writing the opinion, says:

"This pole was not like a bridge or station house, the structure and location of which could not well be forgotten. The engineer of this train testified that, though he had passed this pole many times before, he had never observed how close it stood to the track, while another engineer, called by the defendant, testified that he had observed its proximity to the track."

It is evident that the situation of that pole was not that of a settled structure by the side of the road. The court could not say that its proximity was so obvious as to make it an apparent risk. It there-

fore did not come within the doctrine of assumed risks. It presented a question of contributory negligence. In the Brown Case, 42 App. Div. 548, 59 N. Y. Supp. 672, a mail crane was placed near to the track, and, as the jury has found, nearer than was necessary, and nearer than reasonable care allowed. When the mail bag was hung upon it, part of the crane extended so near to the track as to strike a fireman, and cause his death. It seems that when the mail bag was not upon the crane the arm or bow fell back out of the reach of danger. It does not appear that this fireman had ever seen this crane in the condition in which it was at the time of the accident. It is therefore evident that the risk was not such an obvious one as the law holds to be assumed by a servant entering into the employ of his master. These cases are clearly distinguishable from the case at bar. Here the structures were permanent. They had existed there in the same condition for many years. The intestate knew of their existence. To hold the defendant liable for an injury from a risk which the plaintiff himself understandingly chanced, would, in my judgment, do violence to a well-settled principle of law. I think the judgment was right, and should be affirmed.