.win received the money from Law which was paid upon the unlawful agreement, and from time to time he gave to the defendant sums of money in bills, and, although he was the cashier of a bank, that usually deals largely in evidences of money, yet nothing was made to appear to show by check, entry, or otherwise what this transaction was. It was a payment upon what the defendant knew had been characterized as a void obligation. Baldwin had in no measure guarantied the payment of these notes to the defendant, nor was he under any legal liability therefor, and it may fairly be inferred that business men do not usually pay obligations out of their own pocket upon which exists no legal liability which may be enforced. There was nothing in the transaction between Baldwin and the defendant, so far as developed by this record, which created against the former even a moral obligation to return the money. A mere representation that a given security is good investment, where the security is not owned by the person making the representation, and he receives no benefit therefrom, and the person purchases of his own volition, creates no liability against the person making the representation, either moral or otherwise, and is not so unusual in character as that such person feels called upon to pay the amount of the investment if it happen to turn out to be bad. The particular circumstances, therefore, that the defendant bought these notes, acted as a director during the period specified, participated in the furtherance of the scheme that transferred the control of the association to Levy pursuant to the agreement, and severed his connection the moment it was consummated, received payment in bills from Baldwin of the notes, and Baldwin received money from Law, the proceeds of the illegal action in bills, together with all the other circumstances which the case presents were sufficient for the jury to find that the defendant received payment of the notes, that it was of money belonging to the association, and that he had knowledge of its source. The charge of the court to the jury was clear, full, and complete of all these matters. In fact, it was a model charge in presentation to the jury of the questions which they were called upon to decide. We think their verdict was justified, and should receive support by this court.

The judgment and order should therefore be affirmed, with costs. All concur.

(70 App. Div. 383.)

### TRUE v. NIAGARA GORGE R. CO.

(Supreme Court, Appellate Division, Fourth Department. March 11, 1902.)

1. TROLLEY CARS—INJURY TO CONDUCTOR—NEGLIGENCE.

A trolley car company's negligence is established by proof that, without cause, it constructed its double tracks so that for a few feet they were so close that when cars passed at that point a conductor standing on the running board of one, as it was necessary to collect fares, would be struck by the other, and that the conductor was not warned thereof.

2. SAME—CONTRIBUTORY NEGLIGEN.E.

A conductor standing on the running board of a trolley car, as was necessary in collecting fares, struck by another car at the only point on the line where the tracks were too near to permit cars to pass with

safety to one so standing, engrossed in performance of his duty, and not warned of the danger at that point, or of the approach of the other car, is not, as matter of law, guilty of contributory negligence.

**8. SAME—ASSUMPTION OF RISK.**

A conductor on a trolley line does not assume the risk of being struck by a passing car, while standing on the running board of his car, collecting fares, where the tracks are unnecessarily constructed too near together for only a few feet of the line; he not knowing of the danger, and it not being obvious to him.

Hiscock and McLennan, JJ., dissenting.

Appeal from trial term, Niagara county.

Action by Harry W. True against the Niagara Gorge Railroad Company. From judgment on a verdict for plaintiff, and from an order denying a new trial on the minutes, defendant appeals. Affirmed.

Argued before McLENNAN, SPRING, WILLIAMS, HISCOCK, and DAVY, JJ.

J. H. Metcalf, for appellant.
P. F. King, for respondent.

SPRING, J. The plaintiff had been a conductor on the Gorge road, a trolley line operated by the defendant from Niagara Falls to Lewiston; and on September 3, 1899, while acting in that capacity, and collecting fares on the running board on one of the defendant's cars, he was struck by another of its cars, approaching on a parallel track from the opposite direction, and was knocked off and thrown under the car, sustaining injuries resulting in the amputation of both legs below the knees. He was at the time 29 years of age, and had been in the employ of the defendant as a conductor operating its cars on this road, which was only about seven miles in length, for 30 days, going over the road from 12 to 15 times daily. These cars were open, for summer use by tourists, and consisted of 13 seats, which extended entirely across the car, without any aisle in the car, so that the running board was used by the conductors in the collection of fares. Each seat was supposed to hold five people, when filled, and the car on which the plaintiff was riding at the time he was injured contained 53 people. The seats were somewhat close together, so that when one was occupied there was no space between the passengers and the seat in front, and it was inconvenient and even impracticable for the conductor to crowd in front of them, between the seats, to collect the fares. The roof of the car was supported by posts, which extended out from the body of the car 3 inches, and they were about 32 inches apart, and were placed at the ends of the seats. Iron handle bars were attached to these posts, extending out, also, nearly 3 inches. Along each side of the car was a running board, used by passengers in getting on and off the car, and also by the conductor in the performance of his duties. The outside of the running board extended from the inside of the rail nearest to it 24 inches. On each side of the car, and just inside the handle bars, was a movable guard rail, extending along the length of the car, for the purpose, when down, of preventing passengers from alighting or getting on on that side of the car. The road was a double track, and the plaintiff's proof

shows that at the point of the injury the distance between the inside rails of these parallel tracks was 3 feet 10 inches, so that two cars could not pass at this point without their running boards overlapping. The witness John Peters, who was an electrician, and in charge of the line work for the defendant at the time of the accident, described the situation as follows:

"The distance was three feet ten,—the inside distance between the two rails. That is, the center of the rail,—the ball of the rail. I observed cars passing at that point at the time I was measuring the track. Different times I worked right there, and I observed the men arguing over it. In testing it, a man was working for me, and got between the two cars, and stood on the running board to let another car pass. I hollered at them to get out of that; they would get killed. The men had to get up in the car. They leaned up forward in the car, between the two stanchions, to let the car pass. I saw the two cars passing, and I observed the distance they were apart. Two or three men stood between the cars, and they had to get into the cars to avoid being struck. I stood there myself. I stood on the running board, and I had to lean up in the car while the car passed."

McGrath, who was a conductor of the defendant, and was at the place where the injury occurred within two or three hours thereafter, and measured the space between the tracks, testified:

"I noticed cars passing each other there. I noticed the cars could pass together, but the boards would lap. The edges of the running boards would lap over. One would be a little higher than the other, so that it could just lap over the top. This handle bar was about two inches or two inches and a half out from these standards or posts. When the cars pass there, a man couldn't stand on the running board; that is, not with safety. He could stand there and get the same as True got,—his legs cut off. It would be impossible for him to stand there without being struck. The next afternoon I went there and measured. I had the point shown to me by the motorman that was on with True at the time, and the two of us took measurements. We measured in two different places there, and there was a variation of about two inches in the two measurements. One place it was three feet ten, and the other place three feet eleven."

The usual space between the inside rails of these two tracks was 5 feet 3½ inches, but the witness referred to and others who measured the space at the point of the accident testified that they were only 3 feet 10 inches apart where the accident occurred. Whatever the actual distance was, the witness who made the experiments, and observed others standing on the running board of one of these cars at this place, testified that, if a man were standing erect on this board, he would be hit by a passing car. It also appears that this narrow space continued only for a short distance, while along the rest of the route, except at the Cantilever Bridge, where the tracks came close together, there was ample space for two cars to pass without injury to one standing erect on either running board, and the conductors did this constantly in the performance of their duties. This close proximity of the tracks continued for about 160 feet, varying from 3 feet 10 inches to 4 feet 4 inches. The space between the handle bars of contiguous cars was about 5 or 6 inches, the witnesses varying somewhat as to the distance. Maps of the tracks were produced, upon measurements made subsequently to the accident by engineers in the employ of the defendant, which show a space in excess of the standard-gauge tracks, but there is evidence

adduced tending to show that immediately after the accident to the plaintiff these tracks were relaid and placed farther apart. This road was constructed close to the edge of the Niagara river, and the perpendicular wall of rock which extended high above the river was blasted and cut off to make the roadbed. Along where these injuries were inflicted some of the rocks jutted out from the face of the wall so that the conductor could not perform his duties on the running board next to this wall. On the day of the accident the plaintiff had started from Niagara Falls on the track nearest to the granite wall, and was on the running board next to the parallel track, collecting fares. It was his duty to perform this labor before reaching the Buttery Elevator Station, which was the first stop in his northern trip, and less than a mile from the starting point. He began at the front of the car, collecting from the passengers of each seat, and as he was north of the Steel Arch Bridge, perhaps 100 feet, was hit by a car going in the opposite direction, and toward which his back was turned. He testified (and he is corroborated in this) that he stood at the end of the seat and was collecting a fare. One witness (a passenger) testified he was making change for a $2 bill which the witness had handed him in payment of two fares. Witnesses on behalf of the defendant testified that plaintiff was swinging around one of the standards when he was struck. The motorman on the approaching car sounded his gong, but the proof tends to show this was a common thing, and was not for the purpose of attracting the attention of the conductor of the other car. The roaring noise of the river in a measure drowned the sound of the gong, but the plaintiff, if he had heard it, would not have apprehended that the gong was ringing to warn him of the danger. It appears that in the month he had been acting as conductor he had always collected fares on the running board, meeting cars on every trip, and there was no clashing,—nothing to apprise him of any danger. The proof shows, also, that before he commenced his service as conductor he was instructed by a brother conductor named Snyder, who had been long in the employ of the defendant. The plaintiff testified (and there is supporting proof of this fact) that Snyder collected fares on the running board, and gave him no instructions that they were to be collected elsewhere; and, what is more significant, Snyder performed his duties on the north-bound trip on the running board next to the other track, instead of on the side nearest to the wall. There was a rope attached to a bell to register the payment of the fares, and which it was his duty to pull upon collecting each fare; and this rope was on the river side of the car, and not accessible from the running board on the opposite side of the car. The proof shows that the guard rail was down at the time the car started from Niagara Falls, to prevent passengers from alighting between the tracks, but this was raised up by the plaintiff to enable him to collect the fares. The evidence also shows that this was usual, and had been done by Snyder when tutoring the plaintiff.

A recapitulation of the prominent facts which were established by the verdict of the jury shows that the plaintiff was riding on the run-

ning board of the car in the usual manner, engaged in the performance of his duties in accordance with the instructions given him. He was in the proper place to collect his fares, and was not aware that while on the running board he was in any danger of being hit by a passing car. The tracks were dangerously close together at this point, not caused by any tapering to unite, for both north and south of the place of the accident the space widened; but the narrow space was probably due to some oversight, for they were removed farther apart after the injuries to the plaintiff, and apparently to avoid. the recurrence of a like catastrophe. It is not important whether, when struck he was standing on the running board, or passing around one of the standards, as long as he was in the line of his duty, performing it in the ordinary manner, and not cognizant of any danger to be apprehended from the passing car. The defendant claims it had a rule requiring the guard rails on the inside of the cars to be kept down, and that this was posted in the usual place for imparting notice to conductors. It is difficult to see any great potency to this question, for, the way the proof was presented, it was essential for the conductor to collect the fares on the inside running board, and certainly the guard rail, if down, would be an impediment to this work, and, instead of mitigating, would have added to, the peril of a person on the running board. But waiving that, it was a question for the jury to determine whether this notice was posted, and their verdict on that proposition settled the fact in plaintiff's favor.

With these facts fixed by the jury, we cannot say the judgment should be disturbed. The proof shows that the defendant had left its tracks at this place in a situation fraught with peril, of which no notice had been given to the plaintiff, and the danger could readily have been averted by the exercise of proper care by the defendant. This condition had existed for some time, and Morgan, the manager of the defendant, knew that at this point the space between the tracks was narrower; and yet nothing was done to widen them out, or to indicate to the conductors that they must keep off the running board when passing over this space. It was the duty of the defendant to furnish a reasonably proper place for the plaintiff to carry on his work. The rule is stated in Kuhn v. Railroad Co., 92 Hun, 74, 36 N. Y. Supp. 339 (affirmed on opinion below in 153 N. Y. 683, 48 N. E. 1105), at page 75, 92 Hun, and page 340, 36 N. Y. Supp.:

"The defendant owed the plaintiff's intestate the duty to exercise reasonable care and prudence to furnish him a safe and proper place in which to prosecute his work, and if it became dangerous, and the danger could be foreseen and guarded against by the exercise of reasonable care, to exercise such care and adopt such precautions as would protect the intestate."

Mohr v. Railroad Co., 55 App. Div. 176, 66 N. Y. Supp. 899; Brown v. Railroad Co., 42 App. Div. 548, 59 N. Y. Supp. 672, affirmed in 166 N. Y. 626, 60 N. E. 1107; Mulvaney v. Railroad Co. (City Ct. Brook.) 21 N. Y. Supp. 427, affirmed in 142 N. Y. 651, 37 N. E. 568; Herdt v. Railroad Co. (Sup.) 20 N. Y. Supp. 346, affirmed in 142 N. Y. 626, 37 N. E. 565,—decisively establish that under the circumstances of this case the defendant's negligence was for the jury.

Nor do we think the plaintiff can be charged with want of care, as

matter of law.  He was insensible of the danger.  It was not observable to him from the car.  He had received no warning of it.  He was in the discharge of his duties in the ordinary way, and his mind was engrossed in their performance.  In Wallace v. Railroad Co., 138 N. Y. 302, 33 N. E. 1069, the plaintiff, a brakeman, was hit by a low bridge; and a verdict was directed in favor of the defendant, which was affirmed by the general term of the supreme court, but reversed by the court of appeals.  The plaintiff knew of the existence of the bridge, but at the time of the accident had his back toward it, and was engaged in the discharge of his duties, and was oblivious to the proximity of the bridge.  The court say at page 305, 138 N. Y., and page 1070, 33 N. E.:

"We do not think that one thus situated can, as matter of law, be charged with negligence because he did not take notice of the fact that he was approaching the bridge, and thus know that he was in a place of danger.  He was in a place where there was danger that the train might break in two, and he was intent upon the discharge of his duty.  It cannot be said that a brakeman is, as matter of law, careless because he does not bear constantly in mind the precise location where the train is, and where every bridge is."

Of like effect are Benthin v. Railroad Co., 24 App. Div. 303, 48 N. Y. Supp. 503; McGovern v. Oil Co., 11 App. Div. 588, 42 N. Y. Supp. 595; Fitzgerald v. Railroad Co., 88 Hun, 359, 34 N. Y. Supp. 824; Brown v. Railroad Co., 42 App. Div. 548-553, 59 N. Y. Supp. 672.  The case under consideration is much stronger for the plaintiff than any of the cases cited; for in each of those the person injured was conversant with the defect which was responsible for the injury, while the plaintiff here had no information of the nearness of the tracks at this particular point.

The dissenting opinion is upon the assumption that the plaintiff knew of the location of these tracks, or by the exercise of care ought to have been cognizant of it.  None of the conductors or motormen who testified appeared to be advised of it, and Snyder, when instructing the plaintiff, gave no information on the subject, but occupied the running board between the tracks at this point in collecting fares; indicating that he had not been apprised of the peril incident to carrying on his work in that way.  In view of these facts, we cannot say that the jury were in error in acquitting the plaintiff of blame in following the usual practice, and in not appreciating the danger.  The pith of the cases cited in the dissenting opinion, like Gibson v. Railroad Co., 63 N. Y. 449, 20 Am. Rep. 552, De Forest v. Jewett, 88 N. Y. 264, and Kennedy v. Railway Co., 145 N. Y. 288, 39 N. E. 956, is that the person injured in each instance was entirely familiar with the defect which caused the injuries, and it was held that the dangers appertained to the employment.  This was not a risk which the plaintiff assumed.  It was not an incident to the business; was not manifest, but was due to the oversight of the defendant, which proper caution would have prevented.  The employer must, to a reasonable degree, perform the obligation resting upon him to safeguard the interests of his employés, before the latter can be charged with assuming the risk with reference to the especial thing which should have been remedied.  Assumption of risks must rest upon knowledge upon the part of the

servant, or the means of acquiring it by the exercise of ordinary diligence. As was said in Eastland v. Clarke, 165 N. Y. 420, 59 N. E. 202 (at page 427, 165 N. Y., and page 204, 59 N. E.):

"It is now the settled law of this state that the risks which a servant assumes are either such as are incident to his employment, after the master has discharged his duty of reasonable care to prevent them, or such as are quite as open and obvious to the servant as the master. * * * A servant does not assume risks which are not obvious, and are not known to him, but are or should be within the knowledge of the master."

The judgment and order should be affirmed, with costs and disbursements to the respondent. Judgment and order affirmed, with costs and disbursements to the respondent. All concur, except HISCOCK, J., who dissents in opinion in which McLENNAN, J., concurs.

HISCOCK, J. (dissenting). I am unable to agree with the conclusion reached by a majority of my associates, that the question of plaintiff's conduct, of his assumption of risks incident to the construction of defendant's road, and of his freedom from contributory negligence was for the jury. I think, upon the other hand, that upon the evidence presented, he, as matter of law, assumed the risks which resulted in his injury, and that it was not permissible for the jury to find otherwise. Defendant's road was only about 7 miles in length. The close proximity of its tracks, which is complained of here, and which resulted in the accident, continued for a distance of nearly 200 feet. Plaintiff had been in the employ of defendant as a conductor operating a car on its road for 30 days, going over the road, including the particular portion under criticism, from 12 to 15 times daily. Most of these trips must have been in daylight. His experience was during the season when there was no snow to cover up or obscure his view of the track. The condition was perfectly patent, and while he might not have known with perfect accuracy, to an inch, how close together cars would come in passing each other at the point in question, still his acquaintance with conditions was or should have been such as to inform him that they would come very close together, and bring into danger one occupying the position which he occupied at the time of his injuries. Under these circumstances, I think the case can be distinguished from, or taken outside of the principles laid down in, Gibson v. Railroad Co., 63 N. Y. 449, 20 Am. Rep. 552; De Forest v. Jewett, 88 N. Y. 264; Kennedy v. Railroad Co., 145 N. Y. 288, 39 N. E. 956; Appel v. Railway Co., 111 N. Y. 550, 19 N. E. 93; Williams v. Railroad Co., 116 N. Y. 628, 22 N. E. 1117. Upon the other hand, I think it cannot be distinguished upon its facts from those especially relied upon by the respondent.

In Wallace v. Railroad Co., 138 N. Y. 302, 33 N. E. 1069, the plaintiff, who was a brakeman, was injured while on top of a train by coming in contact with an overhead bridge. He had made many less trips under it than plaintiff had made over defendant's road. At the time of his injury he was in a position to which he was called by the discharge of his duty, and inasmuch as this duty related to watching his train and guarding against accidents which were liable to happen just at that particular point, and inasmuch as he had no

control whatever over the movements of the train, his position at the time of the accident was largely forced upon him by rules and circumstances over which he had no power. In the case at bar, plaintiff might easily have suspended the collection of his fares for one or two minutes, while passing over the portion of the road in question. Again, as was said by Judge Earle:

"It cannot be said that a brakeman is, as matter of law, careless because he does not bear constantly in mind the precise location where the train is, and where every bridge is."

The weight and common sense of the rule so laid down are apparent at once. It very well might be a hardship to hold, as matter of law, that a brakeman should keep in his mind constantly the precise location of every overhead bridge upon a long line of road. But that argument hardly applies to such situation as there was upon defendant's road, in the short space of seven miles, and which, so far as the evidence shows, was an exceptional, and not a common, condition. But, again, what necessarily must have been of very great weight in the Wallace Case was the fact that the defendant was required to put up "tell-tales," which should warn brakemen of the approach to a bridge. The plaintiff in that case had a right to rely upon the observance of this rule, and such reliance, under very well settled principles, exempted him from the care and caution which he otherwise might have been required to observe.

In Benthin v. Railroad Co., 24 App. Div. 303, 48 N. Y. Supp. 503, the plaintiff's intestate, who was a fireman, was killed while looking out of the side of the engine, by his head coming in contact with a telegraph pole. It was held that he was not to be charged, as matter of law, with knowledge of the precise location of this pole, and of the danger which followed from its situation near the track. But the court, in laying down this rule, comments upon facts which distinguish that case very widely from the one at bar, and which, as it seems to me, sustain defendant's, rather than plaintiff's, contention herein. The court says:

"This pole was but one of many, the correct location of which could not be borne in mind by any employé. This pole was not, like a bridge or station house, a structure the location of which could not well be forgotten."

In addition to this, the accident happened in the nighttime, and the question was fairly before the jury, as stated by the court—

"Whether the night of the accident was so foggy and dark that objects could not be distinctly seen for any considerable distance."

It seems to me that the situation and location of the tracks for a distance of nearly 200 feet upon a road only 7 miles long is much more to be governed by the principles applied to the case of "a station house—a structure—" than to a telegraph pole which is one of many thousand upon a long line of railroad.

In Brown v. Railroad Co., 42 App. Div. 548, 59 N. Y. Supp. 672, where plaintiff's intestate, a fireman, while in the performance of his duty, was killed by being struck by a mail crane located near the road, the court said:

"We think it can hardly be said, as matter of law, that he ought to have seen and avoided this mail crane; for it was but one of many similar con-

trivances located along the line of defendant's road, and, as was said in the
Benthin Case, it 'was not, like a bridge or a station house, a structure the
location of which could not well be forgotten.' "

In this case, as in the Wallace Case, the intestate at the time of his
injury was called upon to perform a duty which was governed by cir-
cumstances not at all under his control, and which therefore did not
give him the opportunity that plaintiff in the case at bar had,—of
selecting a time which should be free from unusual dangers.

In McGovern v. Oil Co., 11 App. Div. 588, 42 N. Y. Supp. 595,
the intestate, a brakeman, while on top of his car, was killed by a low
crossbeam maintained by an oil company. As indicated by the opinion
in the case, it was a serious question whether, within the authority of
the Williams Case, supra, the plaintiff should be nonsuited, or, within
the authority of the Wallace Case, supra, allowed to go to the jury.
The court finally reached the conclusion that the latter case governed;
referring especially to the rule therein laid down, that:

"A brakeman on top of a moving train, as matter of law, is not chargeable
with negligence simply because he does not constantly bear in mind the pre-
cise location where his train and where every bridge over the track is."

In Fitzgerald v. Railroad Co., 88 Hun, 359, 34 N. Y. Supp. 824,
plaintiff's intestate, who was a freight brakeman, was killed by com-
ing in contact with a low bridge. It is sufficient in disposing of this
case to call attention to the fact that at the time of the accident it was
not light, and that intestate had only been over he road once before.

The disposition by the court of appeals of the recent case of Young
v. Railroad Co., 166 N. Y. 227, 59 N. E. 828, merits consideration
upon this question. Plaintiffs' intestate in that case was an engineer
upon defendant's road. He was killed by having his train, through
a misplacement of a switch, run on a siding. While the red light upon
the switch indicated that it was open, and that therefore there was
danger, in consequence of the construction of certain obstructions by
the side of the track, and the location of the switch signals, the in-
testate could not see the danger signal in time to avoid the collision.
Plaintiffs' intestate had been at work upon the road a long time, and
upon the trial the plaintiffs were nonsuited upon the ground that the
deceased assumed the risks of the dangers resulting in his death, since
he had the same knowledge of the location of the switch with ref-
erence to the obstructions that the defendant had, and, if the place was
dangerous, he knew, or should have known, what the situation was,
and therefore assumed the risks. The appellate division (45 App. Div.
296, 61 N. Y. Supp. 202) reversed the judgment of nonsuit, saying,
"We believe it to be settled  *  *  *  by repeated adjudications that
a servant is not bound at all times and under all circumstances to be
mindful of the dangers which surround him while engaged in the per-
formance of his duty, even though he may be well aware of their exist-
ence," and then cited the cases which are now relied upon to sustain
plaintiff's contention in this case, and to which reference has already
been made. The court of appeals, while affirming the judgment of the
appellate division, very distinctly declined to overrule the decision of
the trial judge that the deceased assumed the risks of his occupation
incident to the situation of the switch light and structures referred to,

or to affirm the judgment of the appellate division upon this question; placing its decision upon an entirely separate and distinct ground.

It seems to me that unless we are to abrogate the rule, once thoroughly established, that an employer was not bound to change the location and situation of his structures like the one in question, and that an employé assumed the risks incident to a perfectly open and patent condition, we must be led to the conclusion in this case that plaintiff is to be charged, as matter of law, with the risks which resulted in his accident.

In addition to this main issue, in my judgment there are exceptions to the rulings of the trial judge which present close and somewhat troublesome questions; but, in view of the conclusion reached upon the proposition above discussed, it does not seem necessary to go over them at length.

The judgment and order should be reversed, and a new trial granted, with costs to appellant to abide event.

McLENNAN, J., concurs.